IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Charles P. Jones,                          )
                    Plaintiff,             )
                                           )
                                           )
        v.                                 )
                                           )         Civil Action No. 06-129***
Thomas Carroll, et al                      )
                    Defendants.            )

## STATE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Thomas Carroll, Warden, Alisha Profaci, Staff Lieutenant, Peter Forbes, Lieutenant, and Joseph Pomella, Correctional Officer ("State Defendants") by and through undersigned counsel, hereby respectfully move this Honorable Court pursuant to Fed. R. Civ. P. 56(c), to enter judgment in their favor as to all claims on the following grounds:

### BACKROUND

1.      Plaintiff, Charles Jones, is a 35 year old former inmate who was released from the custody of the Delaware Department of Correction on or about June 19, 2007. He is presently living at 20 South John Street, Apt. 2, Newport, Delaware 19804.
Prior to Jones' release, he was from time to time incarcerated at the Delaware Correctional Center (DCC), Smryna, Delaware, starting in 1991.

2.      Charles Jones testified that during his incarceration, in or around July 2005, when inmates were released for recreation on the tier, he beat up inmate Anibal Melendez. See Deposition Trans. Pg. 50, lines 2-14 attached as Exhibit A. Jones claims that other inmates were present and watched the fight. Id. Charles Jones' deposition testimony:

1

> And then, let me see, we fought, I wind up beating him up.
> After he started swinging on me and I beat him up, I really
> only wanted him to back up. He couldn't even fight. So
> that's why I like, I backed up. I was like, 'you starting all
> this trouble and you can't fight?' And I left him alone. But
> then as soon as we go back in the cell he start threatening
> me, say, 'I'm going to kill you, I'm going to kill you.'
> <u>Dep. Trans. Pg. 51</u> .

3.      Jones testified he told an unknown officer doing count on the 8 to 4 shift several

days before he fought Melendez in July that Melendez was threatening him. Jones stated,

"I say, He [Melendez] keep talking about what he going to do and everything. Split us

up." … "I told him to split us up. But he can't do it. He has to report it to whoever the

building sergeant is." <u>Id.</u> pg. 54.  Jones further testified that he did not speak to any other

correctional staff or anyone else prior to his fight with Melendez. <u>Id.</u>

4.      After Jones and Melendez fought in July, Jones alleges that he told Correctional

Officer Pomella that Melendez "keep threatening." <u>Id.</u> at 52. However, Jones' sworn

testimony points toward Melendez' making threats against his own cellmate, not Jones as

he stated in his deposition,

> Q.      And so then what happened after the fight?
>
> A.      Nothing at the time. But then like late that night he started
> threatening me again, something about he going to get me. Then the next
> day we came out, like inmates will go to different inmate's cells still
> locked in and talk to them. So after he talked to the inmate Puno, he wind
> up calling me when I came out later that night to clean the tier up.
>
> Q.      Who called you?
>
> A.      Puno. And told me to watch myself, because he going to get me, he
> going to stab me.
>
> Q.      And what did you do after Puno told you this information?
>
> A.      Kept cleaning the tier.

Q.      That's it?

A.      Yep.

Q.      And did you have to clean by Melendez's cell?

A.      Yes.

Q.      Did you have any contact or words with him?

A.      I asked him, I said, 'You told him you going to get me, you going to stab me?' He was like, 'Yeah, I'm going to get you.' So this went on for days, he kept threatening me. That's when I told Pomella that he keep threatening me, that he going to kill me, he going to do this. And then that's when after that Lieutenant Forbes came to the tier. I talked to Lieutenant Forbes because Melendez's celly talked to him too and told him that, 'He keep threatening me. I'm not trying to sleep in here, he said he going to kill me.'

Dep. Trans. Pgs. 56-58.

5.      Between July and September, Jones continued his daily job as tier-man cleaning the tier where he and Melendez were housed, and continued his regular tier activities i.e., going to chow and recreating without any incidents.

6.      On or about September 12, 2005, at approximately 8:30 p.m., inmates housed on the D-tier, including Jones and Melendez were called for evening recreation. Id. As is typically the case, an officer stationed in the "glass bubble" called for recreation and opened all doors for the inmates to leave their cells. Jones and another inmate, affectionately called "Chicken George" "went to the first set of tables and [were] playing Tonk, a card game." Dep. Trans. Pg. 63.

7.      As the men laughed and played cards and others wandered around unassumingly, Melendez in an instant approached Jones and stabbed him with a sharpened toothbrush. Exhibit A at 76.

3

**STANDARD OF REVIEW**

8.     A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C).Where the moving party produces an affidavit or other sufficient evidence to establish the existence of any essential element for which that party will bear the burden of proof at trial and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party assumes the initial burden to identify evidence that demonstrates the absence of a genuine issue of material fact. Walters ex rel. Walters v. General Motors, Corp., 209 F. Supp.2d 481, 484 (W.D.Pa 2002). Once the moving party meets its burden, then the burden shifts to the non-moving party to demonstrate material issues of fact. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The non-moving party must set forth "specific facts showing that there is a genuine issue for trial ···" or the factual record will be taken as presented by the moving party and judgment will be entered against the non-movant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party may not rest upon mere denials of the facts identified by the moving party, or upon the vague argument that the record contains facts sufficient to support its claims. Childers v. Joseph, 842 F.2d 689 (3d Cir. 1987). Moreover, the non-moving party may not plainly substitute the "conclusory allegations of

the complaint or answer with conclusory allegations of an affidavit." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). As an alternative, the non-moving party must point out in the summary judgment record evidence that creates a genuine issue of material fact. <u>See Celotex Corp. v. Catrett</u>.

## Argument

**A.     <u>JONES FAILED TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES PURSUANT TO PRISON LITIGATION REFORM ACT 42 U.S.C. § 1997e</u>**

9.     Defendants contend that dismissal of Plaintiff's claim is appropriate because he has failed to exhaust his administrative remedies. Prisoners are required to exhaust all administrative remedies before initiating a lawsuit pursuant to 42 U.S.C. § 1983. *See* Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.  Indeed this action is subject to the exhaustion requirements set forth in §1997e (a) which states in pertinent part

> No action will be brought with respect to prison conditions
> under section 1983 of this title, or any other federal law, by
> a prisoner confined in any jail, prison or other correctional
> facility until such administrative remedies as are available
> are exhausted.

<u>See also, Booth v. Churner</u>, 206 F.3d 289, 300 (3d Cir. 2000); <u>Ahmed v. Sromovski</u>, 103 F. Supp. 2d 838, 843 (E.D. Pa. 2000) (quoting <u>Nyhuis v. Reno</u>, 204 F.3d 65, 73 (3d Cir. 2000)).

10.     The PLRA § 1997e exhaustion requirements are twofold. First, a prisoner complaint must pertain to conditions of his or her confinement. The United States Court of Appeals for the Third Circuit understands prison conditions as defined in 18 U.S.C. § 3626(g) (2), to mean "the environment in which prisoners live, the physical conditions of that environment, and the nature of the services provided therein." See <u>Booth</u>, 206 F.3d at

294. Plaintiff Jones was incarcerated at the Delaware Correctional Center at the time inmate Melendez found him unawares and carried out a shocking and vicious attack causing serious injury to Jones' right eye.

11.     Secondly, prison officials must establish an administrative procedure to remedy prisoner complaints. The Third Circuit has reasoned that "exhaustion promotes judicial efficiency in at least two ways. When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided. And, even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." Jenkins v. Morton, 148 F.3d 257, 259 (3d Cir. 1998) (quoting McCarthy v. Madigan, 503 U.S. 140, 146 (1992)).

12.     The State of Delaware Bureau of Prisons has established an Inmate Grievance Procedure whereby "every inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed."  See State of Delaware Bureau of Prisons Procedure Manual, Procedure Number 4.4, Section II (revised May 15, 1998) attached hereto as Exhibit "B". The procedure establishes a three-step grievance process with two levels of appeal. Id. at § V. In order to exhaust all available administrative remedies, a prisoner must complete all stages of review and participate in the appeals process. Therefore the provisions of § 1997 (e) are applicable to him.

13.     The DCC maintains an inmate grievance process which permits prisoners to seek review of the problems they experience during their incarceration time. This process is

designed to provide review and resolution of prisoner grievances. The inmate grievance procedures are made available to every prisoner in the Department's custody. The inmates are required to file formal grievances and appeals to the Inmate Grievance Chair ("IGC") in addition to informal grievances in order to fully exhaust their administrative remedies.[1] After a written grievance is submitted to the IGC,[2] investigation into the matter will be initiated and informal resolution attempted. If informal resolution is unsuccessful, the inmate grievance resolution committee ("RGC")[3] will convene and a hearing will be held, culminating in a recommendation which is forwarded to the Warden or his designee ("Warden"). If the Warden and the grievant concur with the RGC recommendation, the IGC closes the file and monitors issues of compliance. If the parties do not concur, the matter is referred to the Bureau Grievance Officer ("BGO"), who reviews the file. If the BGO concurs with the Warden's decision and the Bureau Chief of Prisons accepts the BGO recommendation, the IGC closes the file and monitors compliance. Alternatively, the BGO can attempt mediation between the grievant and the Warden or recommend outside review of the matter. See Exhibit "B".

14.    The BOP procedure for inmate grievances also provides for an emergency grievance. An emergency grievance is defined as "an issue that concerns matters which under regular time limits would subject the inmate to a substantial risk of personal,

---

[1]"All inmates, regardless of physical condition/security status/administrative status, shall be entitled to use the IGP." BOP 4.4, Section V.

[2] The grievance process begins when an inmate files a Form #584 which must be completed within 7 calendar days following the incident and forwarded to the IGC.

[3]The RGC is a committee comprised of institutional security staff, treatment staff, and inmate representatives that hears inmate grievances and makes a recommendation to the Warden/Warden's designee.

physical or psychological harm." Id. at § IV.  Such emergency grievances are expedited.

Its procedure provides in relevant part:

> Issues that concern substantial risk of personal, physical or psychological inmate injury shall be addressed immediately by the Warden/Warden's Designee. A copy of the grievance shall be sent to the Inmate Grievance Chair upon receipt by the Warden/Warden's Designee. And the Warden/Warden's Designee shall respond within one calendar day. Grievant appeals of the Warden/Warden's Designee's decision will be decided by the Bureau Chief of Prisons within one calendar day upon receipt of the emergency appeal. NOTE: If the Warden/Warden's Designee should determine that the grievance does not meet the emergency criteria, the grievance shall be returned to the inmate for processing through the normal IGP process steps.

Id. at section V.

15.    During Jones' deposition testimony he denied that he fully exhausted his

administrative remedies. Dep. Trans. Pgs. 90-91 at Exhibit A.

> Q.    Now, let me ask you, you're aware of the DOC grievance procedure, correct?

> A.    Yes.

> Q.    You've used it before, correct?

> A.    Yes.

> Q.    Now, in your complaint on page 2, Question B, and this is you reprinted the complaint form that you filed with the court, and the question asked, "Have you fully exhausted your available administrative remedies regarding each of your present claims?" And you write "No."

> A.    Yes.

> Q.    And then the complaint further asks: "if your answer to B, "that would be the previous question, "is no, explain why not." And you write, "The complaint is not

a grievable issue." You wrote that?

     A.    Yes.

     Q.    So you didn't take any action with regard to the grievance procedure in this case, correct?

     A.    Yes.

Although Plaintiff affirms that DCC has an inmate grievance procedure, he clearly denies ever presenting the facts relating to his complaint in the state prisoner grievance procedure. Id.  It is without doubt Plaintiff in no way grieved any issues that concerned a substantial risk of personal, physical or psychological injury. The record is clear Plaintiff did not he file a grievance, thus he did not exhaust available administrative remedies with regard to his allegations regarding threatening behavior by Anibal Melendez or requesting to be moved to another cell or area of the facility. See affidavit of Captain Michael McCreanor attached at Exhibit C. Grievance Officer McCreanor states in his affidavit, "I have reviewed the grievances of Charles Jones ("Jones") and have found no grievances filed by him alleging threatening behavior by Anibal Melendez or requesting to be moved to another cell or area of the facility." Exhibit C.

16.    In the instant case, there is no dispute that Plaintiff was familiar with the inmate grievance procedures. Clearly, Plaintiff cannot offer genuine evidence to demonstrate that he exhausted available remedies prior to filing this action. It is therefore "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. at 45-46.

**B.**    **J**ONES' **E**IGHTH **A**MENDMENT **F**AILURE TO **P**ROTECT **C**LAIM

17.    Reading Plaintiff's Complaint liberally as the Supreme Court instructs, Haines v. Kerner, 404 U.S. 519, 520 (1972),  Plaintiff attempts to state a claim of cruel and unusual

punishment under the Eighth Amendment. However, assuming *arguendo* that all of the well pleaded factual allegations in Plaintiff's Complaint are accepted as true, Plaintiff fails to prove any set of facts which would support a claim of Defendants' "deliberate indifference" to Plaintiff's need for protection.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

18.    It is now well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 835 (1994), citing, Helling v. McKinney, 509 U.S. 25, 35 (1993). Supreme Court cases have held that officials violate the Eighth Amendment only when two (2) requirements are met.  First, the deprivation alleged must be objectively "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991); a prison official's acts or omission must result in the denial of "the minimal civilized measure of life's necessities," Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Second, to violate the cruel and unusual punishment clause, a prison official must have a "sufficiently culpable state of mind." Wilson, 501 U.S. at 302-303.  The sufficiently culpable state of mind has routinely been denoted as deliberate indifference to deprivation of the victim's constitutional rights.  Wilson v. Seiter, Farmer v Brennan, Estelle v. Gamble.

19.    The instant complaint against the defendants fails as the defendants were not deliberately indifferent to plaintiff's plight.  The defendants conduct during this time period does not imply the deliberate indifference requisite which is needed for an Eighth Amendment claim.  In essence, deliberate indifference is established only if plaintiff alleges and proves that defendants knew he faced a substantial risk of serious harm and

that they disregarded that risk by failing to take reasonable measures to abate it.  Farmer, 511 U.S. at 835.  In other words, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Id.

20.    Here, plaintiff fails to establish that the defendants knew he faced a substantial risk of serious harm or that they disregarded this risk by failing to take reasonable measures to abate it.  In fact, it is clear from the affidavits, none of the Defendants had knowledge that there was any contentiousness between Jones and Melendez. See affidavits of Peter Forbes, Alisha Profaci, Joseph Pomella and Timothy Timmons attached as Exhibits D, E, F, & G. A prisoner normally proves deliberate indifference of defendants to his impending harm by showing he complained to prison officials about a specific threat to his safety. McGill v. Duckworth, 944 F.2d 344, 349 (7th Cir. 1991), cert. denied, 112 S. Ct. 1265 (1992). In this instant case, Jones cannot prove that he complained to the officials of an impending harm or specific threats to his safety. See Timmons affidavit at Exhibit G.   No facts suggest that defendants knew plaintiff himself faced a substantial risk of serious harm and disregarded the risk. Ex. D-G. Staff Lieutenant Profaci, who has approximately 20 years experience with the Department of Correction, states that "At no time did Jones tell me that Melendez was a violent person. In cases where an inmate complains that another inmate poses a threat to him then an investigation is done to see if the allegations are credible. If the allegations can be verified then the inmates are separated. An inmate who feels threatened by another inmate can also request to be placed in protective custody." Profaci Affidavit at Exhibit E. Moreover, Lieutenant Forbes denies that he had knowledge of the relationship between Jones and Melendez.

<u>Forbes Affidavit at Exhibit D</u>.  So too, each department official in close contact and supervision of Jones and Melendez substantiate that each was unaware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he reasonably could draw the inference.

21.     Prisons are violent and dangerous places.  <u>McGill v. Duckworth, 944</u> at 345.  Consequently, some level of brutality and aggression among inmates is inevitable no matter what action is taken.  <u>Id</u>. at 345.  Nonetheless, liability on prison officials simply will not lie when "reasonable steps have been taken to prevent violence, but those measures fail."  <u>Duane v. Lane</u>, 959 F.2d 673, 677 (7th Cir. 1992).

22.     Moreover, the instant complaint against the defendants fails as the defendants were not deliberately indifferent to plaintiff's plight.  The defendants conduct during this time period does not imply the deliberate indifference requisite which is needed for an Eighth Amendment claim.  In essence, deliberate indifference is established only if plaintiff alleges and proves that defendants knew he faced a substantial risk of serious harm and that they disregarded that risk by failing to take reasonable measures to abate it.  <u>Farmer</u>, 511 U.S. 825 at 837.

23.     In the final analysis, defendants could not disregard a risk of which they were completely unaware. They simply had no antecedent knowledge that Melendez presented a specific threat of harm to Jones.  In turn, they cannot be deemed deliberately indifferent by failing to take reasonable measures to abate a situation of which they were unaware.

24.     Moreover, a violation of the Eighth Amendment cannot be predicated on mere negligence and requires a finding of a culpable mental state on the part of prison officials.  <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993); <u>Haygood v. Younger</u>, 769 F. 2d 1350 (9th

Cir. 1985).  Therefore, to the extent plaintiff alleges that defendants acted negligently (thereby violating his constitutional rights), such a claim is not cognizable under 1983. See Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986) (holding that to be legally responsible, the officials' misconduct cannot be merely a failure to act): Commonwealth of Pennsylvania v. Porter, 659 F.2d 306, 336 (3d Cir. 1981), cert. denied 458 U.S. 1121 (1982).  In this particular case, at worse, the defendants' actions can only be described as negligent.  Mere negligence, however, does not satisfy the "deliberate indifference" standard. Wilson v. Seiter, 111 S. Ct. at 2328.  Because defendants were unaware that a problem existed, defendants' actions were not deliberate.  Plaintiff's allegations simply do not support the conclusion that defendants violated his rights under the Eighth Amendment; therefore, there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure Rule 56 (c).

25.     According to Jones's sworn statement, affidavits and the pleadings on file, Defendants show that there is no genuine issue as to any material fact, and Defendants are therefore entitled to judgment as a matter of law under FED.R.CIV.P.56(c).

**C.     NO PERSONAL INVOLVEMENT OR RESPONDEAT SUPERIOR LIABILITY**

26.     Plaintiff's claim against Warden Carroll does not demonstrate any personal involvement by him.  Bracey v. Grenoble, 494 F.2d 566 (3d Cir. 1974).  Cleary it is Plaintiff's burden to identify how Warden Carroll participated in, directed, or acquiesced to the events of the plaintiff complaint.  Gay v. Petscok, 917 F.2d 768, 771 (3d. Cir. 1990).  In this case, plaintiff fails to meet his burden. He has not identified any involvement by Warden Carroll. Clearly, plaintiff merely alleges Warden's supervisory

function. However, he does not identify how Warden Carroll violated any of his constitutional rights.

27.    The Third Circuit Court of Appeals has held that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." <u>Rode v. Dellarciprete</u>, 846 F.2d 1195, 1207 (3d Cir. 1988); <u>see also Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978). Personal involvement can be established through allegations of either personal direction or actual knowledge and acquiescence; however, such allegations must be made with particularity. <u>See Rode</u>, 845 F.2d at 1207.

28.    Plaintiff's only involvement with Warden Carroll is testified to when he was transported to Kent General Hospital immediately after the injury. Plaintiff states "the Doctor finally came in, and she just took one look and she was like, 'I'll be right back.' So she came back and that's when she told them that they need to take me to Wills Eye Hospital in Philadelphia." When questioned whether the prison officials took him as advised, he stated, "Well, they couldn't just take me. I heard them call back to the institution and talk to the warden, and I guess he told them to take me." <u>Dep. Trans. Pg. 78</u>. Aside from the fact that Warden Carroll has supervisory capacity over Department personnel, Plaintiff offers nothing to demonstrate that he participated in or approved of a risk to his health or safety.

29.    Certainly, Plaintiff's complaint nowhere presents sufficient facts to support a determination that Defendant Carroll showed deliberate indifference to any particular harm, or that he acted with indifference to an obvious risk of harm created by Plaintiff's placement in the same housing unit with Melendez. Plaintiff's efforts to impose a

14

supervisor liability claim under the Eighth Amendment are insufficient. See, e.g., C. H. ex. rel. Z.H. v. Oliva, 226 F.3d 198, 201-02 (3d. Cir. 2000) (en banc) ("It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."). Indeed, in order to establish supervisory liability, any misconduct of the correction officers must be "affirmatively linked" to the actions or inactions of the Administrative Defendant. Rizzo v. Goode, 423 U.S. 362, 371 (1976).

**D.    DEFENDANTS' IMMUNITY FROM LIABILITY**

30.    Furthermore, defendants are entitled to qualified immunity. A public official is entitled to qualified immunity if the officials "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Good v. Dauphin County Soc. Servs. For Children and Youth, 891 F.2d 1087, 1092 (3d Cir.1989). As the facts as alleged by plaintiff do not show that the officials' conduct violated plaintiff's constitutional right, the officers are entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001). Even assuming, for the purpose of dispute, plaintiff's factual allegations could allege a constitutional violation, the court must then consider whether the right was clearly established. Id. To determine whether a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The "inquiry must be undertaken in light of the case's specific context, not as a broad general proposition." Saucier, 533 U.S. at 201-202.

31.    Instantly, plaintiff alleges that he was deprived of protection from a violent inmate while he was incarcerated at the Delaware Correctional Center in the maximum

security housing unit. However, the institutional records which detail the plaintiff's housing reflects that plaintiff was appropriately classified to maximum security level after he engaged in a fight in April 2004. <u>See Counselor Kramer Classification Sheet attached as Exhibit H.</u> As a result, a reasonable person in the Defendants' position would have understood that plaintiff was classified in the appropriate housing unit, and absent any complaints or evidence of risk of harm would have understood that his safety was not in any jeopardy.

32.    In <u>Cephas v. Truitt</u>, 940 F. Supp. 674 (D. Del. 1996), the plaintiff inmate alleged that defendants failed to protect him from an assault that occurred while he was incarcerated. Specifically, Cephas was assaulted by an inmate while he was being held in administrative segregation, awaiting a hearing from the previous incident. Moreover, plaintiff alleged that the defendant was responsible for placing the perpetrator of the assault in the same area as plaintiff. The District Court granted the defendant's motion for summary judgment upon the findings that "there was no evidence in the record to indicate that defendant was actually of any risk to plaintiff prior to the occurrence of the assault. Additionally, the court found there was no evidence to indicate that the surrounding circumstances existed that should have made the risk of harm sufficiently apparent such that defendant's actions rise to the standard of deliberate indifference." <u>Id.</u> at 681.

33.    To the extent that plaintiff attempts to hold defendants liable in their individual capacities for alleged tortious acts, the State Tort Claims Act shields these defendants as they clearly acted without gross or wanton negligence; their actions arose out of, and in connection with, performance of official discretionary duties.  10 <u>Del</u>. <u>C</u>. §4001.

16

34.    Defendants are also immune from liability under the Eleventh Amendment.  The

Eleventh Amendment stands "for the constitutional principle that State sovereign

immunity limit[s] the federal courts' jurisdiction under Article III."  <u>Seminole Tribe of</u>

<u>Florida v. Florida</u>, 517 U.S. 44, 55 (1996). The United States Congress can waive the

state's sovereign immunity, and therefore, its Eleventh Amendment immunity through

the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive

the states' immunity will produce this result.  <u>Id.</u>  No such clear intent can be seen in 42

U.S.C. §1983.  In fact, Congress' intent appears to be to the contrary as the statute

facially allows suits only to be brought against "persons."  42 U.S.C. §1983.  In this case,

plaintiff seeks money damages against state employees for conduct during the course of

their employment with the Department of Correction. Therefore, Eleventh Amendment

immunity applies to the state officials.

        WHEREFORE, for the hereinabove listed reasons, Defendants request this Court

enter an order for summary judgment in favor of defendants and against plaintiff.

Dated: July 17, 2007                        STATE OF DELAWARE
                                            DEPARTMENT OF JUSTICE

                                              /s/ Ophelia M. Waters
                                            Ophelia M. Waters, I.D. #3879
                                            Deputy Attorney General
                                            Carvel State Office Building
                                            820 N. French Street, 6th floor
                                            Wilmington, DE 19801
                                            (302) 577-8400
                                            Attorney for State Defendants

### CERTIFICATE OF MAILING AND/OR DELIVERY

        The undersigned certifies that on or before July 17, 2007, she caused

The Memorandum in Support State Defendants' Motion for Summary Judgment to be

delivered to the following person(s) in the form and manner indicated:

**NAME AND ADDRESS OF RECIPIENT(S):**

Charles P. Jones
20 South John Street, Apt. 2
Newport Delaware, 19804

**MANNER OF DELIVERY:**

__X__    Two true copies by first class mail, postage prepaid, to Charles P. Jones

_/s/ Ophelia M. Waters_____
Ophelia M. Waters, ID #3879
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

# EXHIBIT A

50

1    Q.    -- as a tier man?

2    A.    This happened September, so around July.  Maybe

3    a little later.

4    Q.    You were tier man at that time?

5    A.    Yes.

6    Q.    So you say he came out of his cell for

7    recreation, you were out of your cell for what reason?

8    A.    Recreation.

9    Q.    You were out for recreation also, you weren't

10   doing your tier man job at this time?

11   A.    No.

12   Q.    Okay.  And you had to beat him up?

13   A.    Yeah, he kept swinging on me.  He didn't leave

14   me no choice.

15   Q.    And who else was there?

16   A.    His celly, Old Man George -- oh, I forgot about

17   Chicken George.  Chicken George is in the handicapped

18   cell.  He come out with the first three cells.

19   Q.    That's somebody different than Old Man George?

20   A.    Right.

21   Q.    Okay.

22   A.    Chicken.  And Pit Bull was there, and I don't

23   know Pit Bull's celly.

24   Q.    Pit Bull was who?

51

1    A.    Samuel Harris.   That's his real name.

2    Q.    They why do they call him Pit Bull?

3    A.    That's what he wants you to call him.

4    Q.    Okay, so who else was out there?

5    A.    And then, let me see, we fought, I wind up

6    beating him up.  After he started swinging on me and I

7    beat him up, I really only wanted him to back up.  He

8    couldn't even fight.  So that's why I like, I backed

9    up.  I was like, "You starting all this trouble and

10   you can't fight?"  And I left him alone.  But then as

11   soon as we go back in the cell he start threatening

12   me, say, "I'm going to kill you, I'm going to kill

13   you."

14            And then an inmate upstairs that he always

15   talked to, called him Puno, I can't remember his real

16   name, he kept telling me too --

17   Q.    Inmate's name is Puno?

18   A.    Yes.  I can't remember his real name at the

19   time right now.  He kept telling me, "Watch out, he

20   going to stab you."  He told me, "He going to stab

21   you, watch out."  So I told the guard that he keep

22   threatening.

23   Q.    Who did you tell?

24   A.    I told -- it's in my paperwork.  I can't think

56

```
1      Q.    Open space?

2      A.    Yes.

3      Q.    And that's where you had the fight?

4      A.    Yes.

5      Q.    That's where you beat Melendez?

6      A.    Yes.

7      Q.    Were you injured on that day?

8      A.    On the side of my head I had a bruise.

9      Q.    How did you get a bruise on the side of your

10   head?

11     A.    When he started swinging.

12     Q.    He hit your head?

13     A.    Yes.

14     Q.    Knock you down?

15     A.    No.

16     Q.    What happened?

17     A.    I defended myself.

18     Q.    And so then what happened after the fight?

19     A.    Nothing at the time.  But then like later that

20   night he started threatening me again, something about

21   he going to get me.  Then the next day we came out,

22   like inmates will go to different inmate's cells still

23   locked in and talk to them.  So after he talked to the

24   inmate Puno, he wind up calling me when I came out
```

1    later that night to clean the tier up.

2       Q.    Who called you?

3       A.    Puno.  And told me watch myself, because he

4    going to get me, he going to stab me.

5       Q.    And what did you do after Puno told you this

6    information?

7       A.    Kept cleaning the tier.

8       Q.    That's it?

9       A.    Yep.

10      Q.    And did you have to clean by Melendez's cell?

11      A.    Yes.

12      Q.    Did you have any contact or words with him?

13      A.    I asked him, I said, "You told him you going to

14   get me, you going to stab me?"  He was like, "Yeah,

15   I'm going to get you."  So this went on for days, he

16   kept threatening me.  That's when I told Pomella that

17   he keep threatening me, that he going to kill me, he

18   going to do this.  And then that's when after that

19   Lieutenant Forbes came to the tier.  I talked to

20   Lieutenant Forbes because Melendez's celly talked to

21   him too and told him that, "He keep threatening me.

22   I'm not trying to sleep in here, he said he going to

23   kill me."

24                And I told him the same thing, I told

1   Lieutenant Forbes the same thing, I was like, "He keep

2   threatening to kill me, and we already done had an

3   altercation, been in a fight.  You need to split us

4   up."

5       Q.   Did you ask for protective custody?

6       A.   No.

7       Q.   Why?

8       A.   For what?  They supposed to split us up.  Once

9   we have an altercation, we should be split up.  They

10  do it every other time.

11      Q.   What do you mean?

12      A.   When other inmates get in altercations with

13  their cellies or other people.  I seen them do it.

14      Q.   You didn't ask for protective custody?

15      A.   No.

16      Q.   You didn't ask Pomella to see that you got

17  protective custody?

18      A.   No.  I asked Forbes, Lieutenant Forbes to split

19  us up.

20      Q.   Because?

21      A.   We already been in an altercation before.

22      Q.   Now, let me ask you, the cells, were they fully

23  occupied on that tier around this time, September of

24  2005?



Charles P. Jones

63

1    Q.    Now, can inmates get inside that bubble?

2    A.    No.

3    Q.    And why is that?  Is it locked?

4    A.    It has a door, yes, locked all the time.

5    Q.    So on this particular evening, I believe you

6    said it was September 12th --

7    A.    Yes.

8    Q.    -- 2005, you say the doors opened for

9    recreation.  What did you do when the doors opened?

10   A.    Me and Chicken George went to the first set of

11   tables and was playing Tonk, a card game.

12   Q.    Now, when the doors opened, what did you do

13   immediately?  Did you just go right out of your cell?

14   A.    Yes.

15   Q.    Who did you see when you went out of your cell?

16   A.    Chicken George.

17   Q.    He was already out of his cell?

18   A.    Yeah.  Well, basically he we was coming out at

19   the same time.

20   Q.    And who else?

21   A.    I seen Old Man George, I seen Melendez, and Pit

22   Bull.  I don't recall seeing Pit Bull's celly.

23   Q.    What were they doing when you saw them?  You

24   were coming out of your cell?

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

78

1      A.    The doctor finally came in, and she just took

2   one look and she was like, "It's nothing we can do for

3   his eye here."  And she was like, "I'll be right

4   back."  So she came back and that's when she told them

5   that they need to take me to Wills Eye Hospital in

6   Philadelphia.

7      Q.    Did they do that?

8      A.    Well, they couldn't just take me.  I heard them

9   call back to the institution and talk to the warden,

10  and I guess he told them to take me.

11     Q.    So they took you?

12     A.    Well, I went in the ambulance then.

13     Q.    Oh, okay.

14     A.    I was in the ambulance, and I think two CO's

15  was in the ambulance with me and another one followed

16  in a van.  I think they called and another one came.

17     Q.    Do you know who the officers were --

18     A.    No.

19     Q.    -- that went in the ambulance or followed in

20  the van?  You don't recall any of those officers?

21     A.    No.

22     Q.    And what happened when you went to Wills Eye

23  Institute in Philadelphia?

24     A.    They gave me some pain meds.  Was asking me



Charles P. Jones

90

1    A.    Right.

2    Q.    Okay.  Any other time?  Did you talk to Pomella

3  after you were stabbed?

4    A.    No.

5    Q.    Was that the only time you talked to him before

6  you were stabbed?

7    A.    Yes, unless I needed supplies when I was

8  cleaning the tier.

9    Q.    So it was more other matters, nothing

10  concerning Melendez?

11    A.    Right.

12    Q.    Okay.  And when you talked to him about

13  Melendez, he then went up the chain of command?

14    A.    That's what I assume.

15    Q.    And you haven't sued Melendez, correct?

16    A.    No.

17    Q.    Now, let me ask you, you're aware of the DOC

18  grievance procedure, correct?

19    A.    Yes.

20    Q.    You've used it before, correct?

21    A.    Yes.

22    Q.    Now, in your complaint on page 2, Question B,

23  and this is you reprinted the complaint form that you

24  filed with the court, and the question asked, "Have

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1    you fully exhausted your available administrative

2    remedies regarding each of your present claims?"  And

3    you write "No."

4        A.    Yes.

5        Q.    And then the complaint further asks:  "If your

6    answer to B," that would be the previous question, "is

7    no, explain why not."  And you write, "The complaint

8    is not a grievable issue."  You wrote that?

9        A.    Yes.

10       Q.    So you didn't take any action with regard to

11   the grievance procedure in this case, correct?

12       A.    Yes.

13       Q.    Okay.  Let me just ask you, the disciplinary

14   history that you described, is there any more about

15   your disciplinary history that you haven't mentioned?

16       A.    No.

17       Q.    So you haven't been in any fights?

18       A.    No.

19       Q.    You haven't been disciplined for violating the

20   rules?

21       A.    No.  Talking in the chow hall one time.

22       Q.    I'm sorry?

23       A.    For talking in the chow hall one time.

24       Q.    What happened?

# EXHIBIT B

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| | 4.4 | 1 OF 7 |
| BUREAU OF PRISONS | RELATED ACA STANDARDS: | |
| PROCEDURE MANUAL | 36 | |
| CHAPTER: 4 DECISION-MAKING RELATING TO INMATES | SUBJECT: INMATE GRIEVANCE PROCEDURE | |
| APPROVED BY THE CHIEF, BUREAU OF PRISONS: *[signature] Carl W. Howard* | | |
| EFFECTIVE DATE: *Revised* 5/15/98 | | |

I.  **AUTHORITY:**  DOC Policy 4.4

II.  **PURPOSE:**

To establish an Inmate Grievance Procedure designed to reduce tension in correctional facilities and to effectively resolve the vast majority of cases within our system.  Every inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed.  NOTE:  Inmates are encouraged to seek their counselors' advice on how to best pursue a response to concerns before prematurely filing a grievance under the guidelines that follow.

III. **APPLICABILITY:**

All BOP employees, volunteers, persons or organizations conducting business with the BOP: all inmates under BOP custody or supervision.

IV.  **DEFINITIONS:**

A.  Bureau Grievance Officer (BGO):  A BOP employee who reviews and mediates appeal of the Warden's/Warden's Designee decision.

B.  Emergency Grievance:  An issue that concerns matters which under regular time limits would subject the inmate to a substantial risk of personal, physical or psychological harm.

C.  Grievance:  A written complaint concerning the substance or application of a policy or practice; any action toward an inmate by staff or other inmates; any condition or incident within the institution that affects an inmate.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 2 OF 7 |
| SUBJECT:   INMATE GRIEVANCE PROCEDURE | | |

D.    Inmate Grievance Chair (IGC):  An institutional
      employee designated to handle inmate grievances.

E.    Inmate Grievance Procedure (IGP):  The formal process
      provided to inmates to resolve disputes.

F.    Outside Reviewer:  An individual not associated with
      DOC who hears inmate grievance appeals referred by the
      BGO and Bureau Chief of Prisons.

H.    Resident Grievance Committee (RGC):  A committee
      comprised of institutional staff and inmates that hears
      inmate grievances and makes a recommendation to the
      Warden/Warden's Designee.

I.    Reprisal:  Any action or threat of action against
      inmates or staff based solely on their participation or
      use of the IGP.

J.    Medical Grievance Committee (MGC): An institution's
      specific medical review authority comprised of a
      minimum of three medical services contractual staff
      from the following list:

          Health Services Administrator
          Director of Nursing
          Charge Nurse
          Chief Medical Officer
          Medical Records Clerk
          Mental Health Counselor
          Chief Dental Officer
          Dental Assistant

V.   PROCEDURE:

1.    Copies of the IGP shall be available in each
      institutional housing unit, in each library, in each
      counselor's office, and in each IGC office.

2.    All inmates, regardless of physical condition/security
      status/administrative status, shall be entitled to use
      the IGP.  Inmate complaints regarding policies and
      conditions must be within DOC jurisdiction.  This
      includes actions by employees, inmates, and incidents
      occurring within the institution that affect them
      personally.  NOTE: Policies that have their own formal
      appeal mechanisms are not grievable through the IGP.
      Specifically excluded from the IGP are issues
      concerning Disciplinary, Classification, and Parole

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 3 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

Board decisions.

3.     The IGP shall afford the grievant a meaningful remedy. Relief may include an agreement by the Warden/Warden's Designee to remedy an objectionable condition within a reasonable, specified time period; change in institutional policy or practice; or restitution.

4.     The IGP prohibits reprisals against staff or inmates for their use or participation in the process.  If either participant experiences adverse reactions, they may appeal directly to the Warden/Warden's Designee. The Warden/Warden's Designee shall offer a written response within 10 calendar days upon receipt of the appeal.  This decision is appealable to the Bureau Chief of Prisons for final disposition.

5.     No staff or inmate named as a party to the grievance shall participate in any capacity in the resolution decision.  This instruction includes contact for purposes of information gathering not merely decision making.  Grievances filed against the IGC or appealing authority shall be referred to the next higher authority.

6.     All grievances shall be kept separate from the inmate's master file.  Neither staff or inmates shall have access to these records except to the extent necessary for clerical processing, resolution, or decision compliance.

7.     The maximum period between initial grievance receipt and final appeal response shall not exceed 180 calendar days.  If a full RGC cannot be convened as scheduled, another hearing shall be rescheduled within 7 calendar days.

8.     Inmates are prohibited from submitting more than one grievance arising from a single incident.

9.     If more than one inmate files a grievance on the same incident, the IGC will consolidate the staff investigations and RGC hearings into a single "group grievance".  All individuals involved will be notified by the IGC.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 4 OF 7 |
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

10. The IGC shall provide a copy of the response to each IGP step to the grievant within 7 calendar days of IGC receipt.

11. The RGC shall be comprised of two inmates who are elected by a majority vote from their own housing unit and two staff designated by the Warden/Warden's Designee. Designated staff should include custody and treatment staff, as well as, those who have frequent contact with the grievant's housing unit. Each RGC member has one vote; the IGC shall only vote to break a tie.

12. Inmate RGC members and two inmate alternates shall serve for a term of six months. Staff RGC members serve at the discretion of the Warden/Warden's Designee. One staff member shall be from Treatment and one from Security.

13. The RGC shall deliberate on its findings and forward its recommendation to the Warden/Warden's Designee.

14. All investigative work must be completed and documented prior to the RGC hearing.

15. Inmates are allowed to retract a grievance at any time during the process by written notice to the IGC.

16. The IGC shall submit a monthly IGP status report to the BGO and the Bureau Chief of Prisons.

17. The BGO and the Bureau Chief of Prisons share responsibility for IGP revisions/amendments. Distribution to all points of inquiry listed in #01 above shall be the responsibility of the Warden/Warden's Designee.

18. Remedies which are dependent on departments or agencies outside of the DOC may require more time for coordination of implementation steps. The IGC shall notify the grievant of the implementation plan and schedule upon receipt of written notification of concurrence by the outside entity.

19. The specific duties of the IGC and BGO are listed in the "Inmate Grievance Procedure Training Manual". Analysis of their performance is the sole responsibility of their immediate supervisors.

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 5 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

## IGP RESOLUTION LEVELS

### Level I (Informal Resolution):

The IGP process begins when an inmate files Form #584. The grievant must complete this form within 7 calendar days following the incident and forward to the IGC. The IGC shall forward the grievance to the inmates' housing unit supervisors within two days of their receipt. Housing unit supervisors shall investigate, document all findings on Form #175, attempt resolution and report results to the IGC within 3 calendar days of their receipt of the grievance. Resolution ends the IGP process; the IGC closes the file and monitors issues of compliance. Unresolved grievances are referred to Level II administration.

### Level II (RGC Recommendation/Warden's Decision):

The RGC will convene within 30 calendar days of IGC receipt of the grievance to examine the issue and documented investigative data from Form #175, hear testimony, and make a recommendation. The Grievant will be offered the opportunity to participate in the RGC hearing through examination of all information presented and discussion with all participants. The RGC shall ask any question it feels relevant to the issue. If the RGC determines that further investigation is required it may grant an additional five days, by majority RGC member vote and grievant consent, to complete its work. All RGC work is to be documented and forwarded to the IGC on Form #584 RGC Recommendation. The IGC forwards the RGC recommendation to the Warden/Warden's Designee. The Warden/Warden's Designee responds on Form #584 within 10 calendar days and forwards that response to the IGC for distribution. If the Warden/Warden's Designee and grievant concur with the RGC recommendation the grievance is deemed resolved; the IGC closes the file and monitors issues of compliance. If there is no concurrence, the case is referred to Level III administration.

### Level III (The Final Decision):

The BGO will review the grievance file upon receipt. Concurrence with the Warden/Warden's Designee decision and signature by the BGO and Bureau Chief of Prisons ends the IGP process; the IGC closes the file and monitors issues of compliance. At the BGO's discretion, mediation between grievant and the Warden/Warden's Designee may be attempted or Outside Review recommended. The BGO shall recommend Outside Review in only those instances where interpretation of law or expansion of policy are necessary. The Bureau Chief of Prisons may accept or reject the BGO's written

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 6  OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

recommendation.  Decisions by the Bureau Chief of Prisons are
final and not open to grievant interpretation.  The Bureau Chief
of Prisons will return his final decision and the grievance file
to the IGC for closure and monitoring for issues of compliance.

**Emergency Grievance:**

Issues that concern substantial risk of personal, physical or
psychological inmate injury shall be addressed immediately by the
Warden/Warden's Designee.   A copy of the grievance shall be sent
to the IGC upon receipt by the Warden/Warden's Designee.  And the
Warden/Warden's Designee shall respond within one calendar day.
Grievant appeals of the Warden/Warden's Designee decision will be
decided by the Bureau Chief of Prisons within one calendar day
upon receipt of the emergency appeal.  NOTE: If the
Warden/Warden's Designee should determine that the grievance does
not meet the emergency criteria, the grievance shall be returned
to the inmate for processing through the normal IGP process
steps.

**Medical Grievance:**

All medical grievances must be submitted to the Inmate Grievance
Chairperson (IGC) at the respective institution on Form #585.
If, by chance, an inmate sends a grievance directly to the
medical services contractual staff, they are to forward it first
to the IGC who will log it in the institution's grievance log and
then return it to the medical services contractual staff for
action.

The appropriate medical staff will review the grievance and
denote actions taken on the Medical Log Form #586

The medical services contractual staff will attempt an informal
resolution with the inmate, upon discussion over the treatment
defined on the Medical Log Form.   If the Medical Grievance is
resolved the inmate acknowledges this by his signature on Form
#585 Informal Resolution.   This signed form is forwarded to the
IGC who will close out the case.

Failure to resolve the grievance informally, results in a Medical
Grievance Committee hearing which will not include any medical
services contractual staff previously involved in the informal
resolution process.   The IGC and the inmate must be present at
this hearing.

Resolution closes the case; failure to resolve the case results
in the inmate completing the MGC Appeal Statement section of Form
#585.  Upon receipt, the IGC forwards the file to the Bureau

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 7 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

Grievance Officer (BGO).  The BGO recommends a course of action to the Bureau Chief of Prisons, who renders a final decision.

**Universal Grievance:**

Issues that concern the entire system and not just one inmate, a group of inmates, or one institution shall be presented by the BGO to the Bureau Chief of Prisons.

**Institutional Transfer:**

When possible, transfers shall be delayed for any inmate who has filed a grievance and been notified of an RGC hearing date until the hearing has concluded.  If circumstance requires immediate transfer, the IGC at the institution where the grievant filed will proceed in the grievant's absence utilizing the normal IGP process steps through Level II.  The Warden/Warden's Designee decision will be forwarded to the IGC at the grievant's new location for review.  If the grievant appeals to Level III, the IGC at the grievant's new location shall forward the file to the IGC at the original location for BGO review.  Grievances filed against the sending institution after an inmate's transfer, but inside the standard seven day window following an incident, shall be forwarded by the IGC at the new location to the IGC at the original location for processing.

**Appeals:**

Grievant appeals must be signed, dated and state the specific reasons on Form #584 Grievance Appeal.  This form must be given to the IGC who is responsible for tracking the status of each grievance.  The IGC will forward the appeal and grievance file to the BGO.  Grievants shall have 3 calendar days upon receipt of their copy of the Warden/Warden's Designee decision to appeal, as well as, to include any additional information for review at the next level.  NOTE:  The Bureau Chief of Prisons decisions are final and not appealable.

Attachments

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CHARLES JONES     )
          )
          )
   Plaintiff,    )
          )
  v.        )  C. A. No. 06-129***
          )
THOMAS CARROLL et al.,  )
          )
   Defendants.   )

### AFFIDAVIT OF MICHAEL McCREANOR

   I, Mike McCreanor having been duly sworn according to law, deposes and states as follows:

   1.   I make this affidavit based upon personal information.

   2.   I am employed by the State of Delaware, Department of Correction at the Delaware Correctional Center ("DCC") Smyrna, Delaware as a Correctional Captain. My duties include serving as the inmate grievance chairperson. In this role, I process inmate grievances and maintain grievance files and logs.

   3.   I have reviewed the grievances of Charles Jones ("Jones") and have found no grievances filed by him alleging threatening behavior by Anibal Melendez ("Melendez") or requesting to be moved to another cell or area of the facility.

                _____
                Michael McCreanor

SWORN AND SUBSCRIBED before me this _16_ day of July, 2007.

                _____
                   Notary

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CHARLES JONES )
)
)
Plaintiff, )
)
v. )    C. A. No. 06-129***
)
THOMAS CARROLL et al., )
)
Defendants. )

## AFFIDAVIT OF PETER FORBES

I, Peter Forbes having been duly sworn according to law, deposes and states as follows:

1.    I make this affidavit based upon personal information.

2.    I am employed by the State of Delaware's Department of Correction as a Lieutenant at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Among my duties are: directing and supervising lower level officers assigned to a shift program; ensuring that work schedules and plans are developed in accordance with operational needs; making periodic inspections of all areas of the facility grounds, staff and equipment to ensure enforcement of all rules, regulations, policies and procedures and to detect any potential security system defects; directing the control of inmate disturbances and disorders and preparing and/or overseeing the preparation of various reports.

3.    As Lieutenant I reviewed some of the incident reports concerning the altercation involving inmates Charles Jones ("Jones") and Anibal Melendez

("Melendez") on September 12, 2005. The personal property of both inmates was inventoried and transferred to my office.

4.    I had no knowledge of the relationship between Jones and Melendez. Nor do I recall any conversation with Jones asking to be separated from Melendez because of his threatening behavior. Inmates who feel threatened by other inmates are instructed to request to be put in protective custody.


_____
Peter Forbes

SWORN TO AND SUBSCRIBED before me this 16 day of July, 2007.

_____
Notary

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CHARLES JONES                                  )
                                               )
                                               )
       Plaintiff,                          )
                                               )
       v.                                  )        C. A. No. 06-129***
                                               )
THOMAS CARROLL et al.,                         )
                                               )
       Defendants.                         )

## AFFIDAVIT OF ALISA PROFACI

I, Alisa Profaci having been duly sworn according to law, deposes and states as follows:

1.      I make this affidavit based upon personal information.

2.      I am employed by the State of Delaware's Department of Correction ("DOC") as a Staff Lieutenant at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. I have worked for the DOC for almost twenty years. Among my duties are: directing and supervising lower level officers assigned to a shift program; ensuring that work schedules and plans are developed in accordance with operational needs; making periodic inspections of all areas of the facility grounds, staff and equipment to ensure enforcement of all rules, regulations, policies and procedures and to detect any potential security system defects; directing the control of inmate disturbances and disorders and preparing and/or overseeing the preparation of various reports.

3.      On September 15, 2005, around 9:20 PM, I responded to a back up call from Building 21. When I arrived, inmate Charles Jones ("Jones") was sitting in a chair

outside of the control pod in a blood stained T-shirt with a towel over his eye. I asked Jones what had happened and he replied that another inmate, Anibal Melendez ("Melendez") had stabbed him in the eye. I then asked if he and Melendez were cellmates, he said no. I asked him if there had been a problem between him and Melendez and he said that the two of them had an argument a few weeks earlier. Jones said that Melendez was "acting tough" and was always trying to get his cellmate to fight. Jones then told me that he had told Melendez that Melendez couldn't beat him I asked Jones if there was anything else between Melendez and him and he said no.

4.     Jones was seen by medical and was then later transported to the hospital for his eye injury. When I walked by the classroom where Melendez was secured he asked if he could talk to me. Melendez claimed he "didn't do it," and was subsequently transferred to SHU.

5.     At no time did Jones tell me that Melendez was a violent person. In cases where an inmate complains that another inmate poses a threat to him then an investigation is done to see if the allegations are credible. If the allegations can be verified then the inmates are separated. An inmate who feels threatened by another inmate can also request to be placed in protective custody.

_____
Alisa Profaci

SWORN TO AND SUBSCRIBED before me this _16_ day of July, 2007.

_____
Notary

# EXHIBIT F

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

CHARLES JONES              )
                                 )

        Plaintiff,          )

                                 )

    v.                   )     C. A. No. 06-129***

                                 )

THOMAS CARROLL et al.,       )

                                 )

        Defendants.     )

## AFFIDAVIT OF JOSEPH POMELLA

I, Joseph Pomella having been duly sworn according to law, deposes and states as follows:

    1.      I make this affidavit based upon personal information.

    2.      I am employed by the State of Delaware's Department of Correction ("DOC") as a Correctional Officer at the Delaware Correctional Center ("DCC"). My responsibilities include the implementation of prescribed policies and procedures ensuring the enforcement of institutional/departmental rules and regulations for staff and inmates.  Additional duties include directing and participating in shakedowns of buildings, grounds and cell blocks to detect contraband and/or defects in the security system.

    3.      On September 12, 2005, I was assigned to Building #21 with Sgt.Beckles, C/O Jamie Nieves and my partner C/O Timothy Timmons ("Timmons").  Between 8:30 PM and 9:30 PM,  the inmates have recreation. Timmons and I checked the tier for general security and completed a phone punch. The check proved the area was fine and

within normal standards. In the day room I observed inmate Charles Jones ("Jones") and inmate George Davis ("Davis") engaged in a card game. Timmons and I exited the tier block around 9:15 PM. Shortly thereafter, I heard a call for assistance on D-tier and immediately responded where I learned that Jones had been removed from the area after sustaining an injury.

4.     Upon entering the area I observed Jones seated in a desk chair in the correctional officer's workstation area holding his hand over his right eye. It appeared that Jones had sustained a serious injury as there was a significant amount of blood. Medical arrived and evaluated his injury. Jones was later taken to the Kent General Hospital.

5.     After Timmons and I secured the area we were then assigned to inventory Jones' personal items. Officer Jamie Neives later found the weapon used in the incident in the shower drain on D-tier. It was confiscated and retained for evidence. Upon completion of this assignment I remained in the general vicinity without further incident until the conclusion of my assigned shift.

6.     Regarding this incident, at no time leading up to, during and/or the following the assault on Jones did I have knowledge of any aggravating circumstances between Jones and the perpetrator inmate Anibal Melendez. ("Melendez"). I completed my assigned duties without incident. Lastly, I did not observe the actual incident so my

recollections are based on events before and after the incident.

_Joseph A Pomella_ C/O 7-16-07
Joseph Pomella

SWORN TO AND SUBSCRIBED before me this _16_ day of July, 2007.

_____
Notary

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CHARLES JONES | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 06-129*** |
| | ) | |
| THOMAS CARROLL et al., | ) | |
| | ) | |
| Defendants. | ) | |

### AFFIDAVIT OF TIMOTHY TIMMONS

I, Timothy Timmons having been duly sworn according to law, deposes and states as follows:

1.  I make this affidavit based upon personal information.

2.  I am employed by the State of Delaware Department of Corrections ("DOC") as a Correctional Officer at the Delaware Correctional Center ("DCC") Smyrna, Delaware. My responsibilities include the implementation of prescribed policies and procedures ensuring the enforcement of institutional/departmental rules and regulations for staff and inmates. Additional duties include directing and participating in shakedowns of buildings, grounds and cell blocks to detect contraband and/or defects in the security system.

3.  On September 12, 2005, around 9:15 PM, I was working C and D tiers with C/O Pomella. ("Pomella"). Pomella stepped away for a minute while I stayed outside C and D-tiers on the C-tier side.  Shortly thereafter, I heard Officer Nieves ("Nieves") yelling and then I saw inmate Charles Jones ("Jones") standing at the D-tier

pod window with blood on his face around his eye. As Nieves and I entered the tier, we saw inmate George Davis ("Davis") standing with a crutch in his hand and pointing it towards inmate Anibal Melendez ("Melendez"). Nieves and I proceeded to lock down D-tier. Pomella and I then went and secured A, B & C-tiers. When we returned to D-tier, Melendez was being put into restraints.

4.     Sgt. Beckles ("Beckles") and I collected Melendez's personal property for inventory. Later, Pomella and I inventoried his property and then transferred it to Lt. Forbes' office.   S/Lt Alisa Profaci ("Profaci") then asked Pomella and me to inventory Jones' property and send it to the property room. The property forms were subsequently turned over to Lt. Forbes.

5.     I have no knowledge of the relationship between Jones and Melendez. I was never informed by Jones or anyone else that Melendez had violent tendencies.

_____
Timothy Timmons

SWORN TO AND SUBSCRIBED before me this _16_ day of July, 2007.

_____
Notary

# EXHIBIT H

Counselor: __Todd Kramer__

Date: __4-22-05__

DECISION:

____✓____ Approved  _____ Denied

Date _____ _5-5-05_

Signature: _Burr._

Inmate Name: __Jones, Charles__    SBI #: __228197__

Classified From: __Min__    To: __Max__    Date: __4/04__

Reason for current security level: __Fighting April 2004__

Current Level: __3__ as of (date): __1/14/05__ Counselor Proposed Level: __4__

Current Charges: __Traffic Cocaine__

Sentence: __6 years__    STRD: __5/7/07__

Is offender participating in all required programs? Yes __X__    No _____

Disciplinary History (past 90 days): __None on file since 4/04__

_____

_____

_____

## DO NOT WRITE BELOW THIS LINE

_X_ **Up Grade**    _____ **Down Grade**    _____ **Initial**    _____ **Remain**

## FINALIZED LEVEL __4__

_X_ Not A Behavior Problem          _____ Recent Behavior Problems
_____ Positive Program Participation  _____ Refuses to Participate in Programs
_____ Placement due to Classification

_____

_____

(Additional comments)

_P. Pierce_                          _5, 5, 5_

**QOL Review Chairman Signature**          **DATE**

February 2004/dc
QOL Form