IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CHARLES P. JONES,                      )
                                       )
            Plaintiff,                 )
                                       )
     v.                                )   Civ. No. 06-129-SLR
                                       )
WARDEN THOMAS CARROLL, et al.,         )
                                       )
            Defendants.                )

Jeffrey K. Martin, Esquire, of Martin & Associates, P.A., Wilmington, Delaware.
Counsel for Plaintiff.

Ophelia Michelle Waters, Deputy Attorney General, Delaware Department of Justice,
Wilmington, Delaware.  Counsel for Defendants.

**MEMORANDUM OPINION**

Dated: June  24 , 2009
Wilmington, Delaware

ROBINSON/District Judge

## I. INTRODUCTION

Plaintiff Charles P. Jones ("plaintiff"), a former inmate at the James T. Vaughn Correctional Center, formerly known as the Delaware Correctional Center ("DCC"), Smyrna, Delaware, filed this civil rights complaint as a pro se inmate pursuant to 42 U.S.C. § 1983 on February 27, 2006. (D.I. 2) On March 5, 2008, this court granted summary judgment[1] in favor of State defendants former Warden Thomas Carroll ("Warden Carroll"), Staff Lt. Alisha Profaci ("Profaci"), Lt. Peter Forbes ("Forbes"), and Correctional Officer Joseph Pomella ("Pomella") (collectively, "State defendants"). (D.I. 73, 74) The court subsequently granted plaintiff's motion for reargument on August 20, 2008, "based on the fact that plaintiff is now represented by counsel who has garnered more facts for the court's review." (D.I. 78 at 1) On October 15, 2008, plaintiff filed a memorandum in opposition to State defendants' motion for summary judgment. (D.I. 80) State defendants filed their supplemental reply on November 5, 2008. (D.I. 84) For the reasons set forth below, the court will grant in part and deny in part State defendants' motion for summary judgment.

## II. BACKGROUND

It is undisputed that plaintiff sustained a serious injury after another inmate, Anibal Melendez ("Melendez"), stabbed him in the right eye with a sharpened toothbrush on September 12, 2005 at the DCC. (*Id.* at ¶ 1) It is also undisputed that Melendez and plaintiff were housed in close proximity to each other on the same tier at the time of the attack. (D.I. 68 at ¶ 5; D.I. 80 at ¶ 2) Plaintiff claims that encounters

---

[1]The court granted summary judgment on the grounds that plaintiff failed to exhaust his administrative remedies. (D.I. 73)

between Melendez and him began several months before the attack. Plaintiff asserts that, prior to July 2005, he stepped in and prevented several physical confrontations between Melendez and other inmates. (D.I. 80 at ¶ 2; D.I. 81, ex. A at 41-46) Melendez then directed his anger toward plaintiff, cursing and threatening him. (D.I. 80 at ¶ 3; D.I. 81, ex. A at 49) In or around July 2005, Melendez told plaintiff that Melendez was going to kill him. (D.I. 80 at ¶ 4; D.I. 81, ex. A at 50) The next day, as plaintiff exited his cell for recreation, Melendez began "swinging" at plaintiff. (D.I. 80 at ¶ 4; D.I. 81, ex. A at 50) "After [Melendez] started swinging on me . . . I beat him up, [but] I really only wanted him to back up," plaintiff stated in his deposition. (D.I. 82, ex. A at 2)

Following the fight, which plaintiff claims was witnessed by several other inmates, Melendez continued threatening to kill plaintiff. According to plaintiff, another inmate named "Puno" informed plaintiff that Melendez was going to stab plaintiff. (D.I. 80 at ¶ 5; D.I. 82, ex. A at 2) While performing his tier-cleaning duties, plaintiff conversed with Melendez who told plaintiff that "I'm going to get you." (D.I. 82, ex. A at 8) Around late August or early September 2005, after Melendez continued threatening, plaintiff asserts that he told defendant Pomella that "[Melendez] keep[s] threatening me . . . he['s] going to kill me." (*Id.*) Pomella maintains that, prior to the September stabbing, he had no knowledge of any aggravating circumstances between Melendez and plaintiff. (D.I. 68, ex. F at ¶ 6)

Plaintiff asserts that, shortly after his alleged conversation with Pomella, he told defendant Forbes that "[Melendez] keep[s] threatening to kill me, and we already done had an altercation, been in a fight. You need to split us up." (D.I. 80 at ¶ 8; D.I. 82, ex.

2

A at 8-9) Forbes denies having any knowledge of the relationship between Melendez and plaintiff and also states that he does not recall the alleged conversation between plaintiff and him. (D.I. 68 at ¶ 20; *Id.*, ex. D at ¶ 4) Defendant Profaci also denies that plaintiff ever told her that Melendez was a violent person. (D.I. 68 at ¶ 20; *Id.*, ex. E at ¶ 5)

On September 12, 2005, Melendez, plaintiff, and other inmates were released from their cells for a recreation period. (D.I. 80 at ¶ 9; D.I. 82, ex. A at 14) During recreation, while plaintiff and another inmate named "Chicken George" were playing cards, Melendez approached plaintiff from behind and stabbed him in the eye with a sharpened toothbrush. (D.I. 80 at ¶ 9; D.I. 82, ex. A at 16-18) Plaintiff asserts that "[t]here were absolutely no corrections officers in the area [where the stabbing occurred] supervising the inmates." (D.I. 80 at ¶ [sic] 10); D.I. 82, ex. A at 19)

Plaintiff sues State defendants under a failure to protect theory and seeks both lifelong medical care with regard to his eye and damages in the amount of $16 million. (D.I. 2 at 9) In his October 15, 2008 memorandum, plaintiff conceded that his claim against Warden Carroll should be dismissed. (D.I. 80 at ¶ 27) State defendants renew their motion for summary judgment on the bases that plaintiff failed to exhaust his available administrative remedies pursuant to 42 U.S.C. § 1997e, that plaintiff fails to prove any set of facts to support a claim that State defendants were deliberately indifferent to plaintiff's need for protection, and that State defendants are immune. (D.I. 68) Plaintiff asks the court to deny the motion on the bases that he should be excused from the exhaustion requirement, that State defendants failed to protect him despite their knowledge of prior incidents, and that State defendants are not immune. (D.I. 80)

3

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Indeed, to survive a motion for summary judgment, plaintiff cannot rely merely on the unsupported allegations of the

4

complaint, and must present more than the "mere existence of a scintilla of evidence" in

his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the nonmoving

party fails to make a sufficient showing on an essential element of its case with respect

to which it has the burden of proof, the moving party is entitled to judgment as a matter

of law. *See Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

State defendants argue that summary judgment is appropriate because plaintiff

failed to exhaust his administrative remedies prior to filing this action pursuant to the

Prison Litigation Reform Act ("PLRA").[2]  Before filing a civil action, a plaintiff-inmate

must exhaust his administrative remedies, even if the ultimate relief sought is not

available through the administrative process. *See Booth v. Churner*, 206 F.3d 289, 300

(3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001); *see also Ahmed v. Sromovski*, 103 F. Supp.

2d 838, 843 (E.D. Pa. 2000) (quoting *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000)

(stating that § 1997e(a) "specifically mandates that inmate-plaintiffs exhaust their

available administrative remedies")). Under *Woodford v. Ngo*, 548 U.S. 81 (2006),

exhaustion means proper exhaustion, that is, "a prisoner must complete the

administrative review process in accordance with the applicable procedural rules,

including deadlines, as a precondition to bringing suit in federal court." *Id.* at 88. Prison

conditions have been held to include the "environment in which prisoners live, the

---

[2]The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

5

physical conditions of that environment, and the nature of the services provided therein." *Booth*, 206 F.3d at 295. Because an inmate's failure to exhaust under the PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Failure to exhaust administrative remedies must be pled and proved by defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Plaintiff concedes that he failed to exhaust his administrative remedies in the literal sense as outlined by the Delaware Department of Correction ("DOC") administrative procedures.³ (D.I. 2 at 2; D.I. 80 at ¶ 6) The issue thus becomes whether plaintiff's failure to exhaust may be excused. *See Ramos v. Smith*, 187 F. App'x 152, 154 (3d Cir. 2006) (per curiam) (reasoning that, following a finding of a failure to exhaust, the issue becomes "whether this failure can be excused").

"The exhaustion requirement is absolute, **absent circumstances where no administrative remedy is available**." *Monk v. Williams*, 516 F. Supp. 2d 343, 350 (D. Del. 2007) (emphasis added) (citing *Spruill v. Gillis*, 372 F.3d 218, 227-28 (3d Cir. 2004); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000); *Freeman v. Snyder*, No. 98-636, 2001 WL 515258, at \*7 (D. Del. Apr. 10, 2001) (finding that, if no administrative remedy is available, the exhaustion requirement need not be met)). "If prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are 'available' to him." *Monk*, 516 F. Supp. 2d at 350 (citing *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002)).

_____

³The procedures require that a prisoner file a grievance within seven calendar days of the incident.

6

Plaintiff advances two arguments for excusing his failure to exhaust. First, plaintiff asserts that the grievance procedure was not available to him because a corrections officer informed him that he could not file a grievance on the issues of housing and inmate security. (D.I. 83, ex. B at ¶ 14) Plaintiff also alleges that the grievance procedure was not available to him due to his heavily-medicated condition in the days following his surgery. (*Id.* at ¶¶ 10-12) State defendants direct the court to the record and argue that, at the close of discovery, it is not sufficient for plaintiff to rely on nothing more than his own averments in this regard.

The question, then, is whether plaintiff has sufficiently raised a genuine issue of material fact to preclude entry of summary judgment in favor of defendants. With respect to plaintiff's alleged reliance on an incorrect statement of the DOC grievance procedures allegedly made by an unidentified corrections officer before plaintiff was attacked, the court finds that plaintiff has failed to raise such an issue. State defendants have demonstrated the absence of material fact, as the record is devoid of any evidence supporting plaintiff's claim of being misled.[3] Plaintiff has presented no more than unsupported assertions to the contrary.[4]

---

[3]This case at bar is distinguishable from the Third Circuit's decision in *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002), where the Court held that such an unsupported averment was sufficient to withstand a motion to dismiss and warrant discovery on the factual dispute.

[4]In his sworn affidavit, plaintiff alleges that, prior to the stabbing but after the initial fight with Melendez, plaintiff addressed his safety concerns with "a corrections officer." (D.I. 83, ex. B at ¶ 14) Plaintiff maintains that the correctional officer "told [him] that [he] could not file a grievance on this issue because housing and inmate security were issues that had to be addressed through prison security. In response, [plaintiff] made a complaint to [Pomella] regarding [Melendez's] access to [him]." (*Id.*)

7

The court finds, however, that plaintiff has raised a genuine issue of material fact with respect to his medical condition after the stabbing. In addition to his assertions in this regard, the medical records themselves lend support to the following: (1) plaintiff underwent complicated surgery that required a three-day stay in the hospital (D.I. 85, ex. D-1); (2) he was on medication through at least day six[5] (id., ex. C); and (3) although plaintiff was described in the medical records as being oriented and ambulatory, a post-surgical patient's ability to follow directions from a nurse does not necessarily equate to the ability to independently perform new tasks.[6] A jury should decide the issue of whether plaintiff's assertions in this regard are credible.

Based on the evidence presented by plaintiff, a reasonable fact-finder could conclude that plaintiff's post-surgery condition rendered the DOC administrative remedies unavailable to plaintiff. If the fact-finder so concluded, his failure to exhaust would be excused. See Monk, 516 F. Supp. 2d at 350. Therefore, in viewing the facts and inferences in the light most favorable to plaintiff, summary judgment is inappropriate on the issue of exhaustion.

---

[5]State defendants' exhibit shows that, on September 19, 2005, six days after the surgery, plaintiff was prescribed Avelox, Tylenol, and several brands of eye drops. (D.I. 85, ex. C) The side effects of Avelox, an antibiotic, include dizziness, nausea, and diarrhea. See http://www.avelox.com/scripts/pages/en/home/index.php (follow "For Patients" hyperlink; follow "Avelox and Bronchitis" hyperlink; follow "Role of Avelox" hyperlink).

[6]State defendants assert that certain "sick-call complaints" written by plaintiff after his surgery negate his arguments that he was unable to prepare a grievance due to his medical condition. (D.I. 84 at ¶ 4) State defendants' contention is without merit. The sick-call complaints referenced by State defendants were written by plaintiff approximately one and a half months after his surgery, in late October, and have no bearing on his condition during the seven days following his surgery. (Id., exs. E1-E4)

### B. Failure to Protect

Because the existence of a genuine dispute regarding exhaustion precludes summary judgment on that issue, the court turns to the merits of plaintiff's constitutional claims. *See Spruill*, 372 F.3d at 235. Plaintiff raises an Eighth Amendment failure to protect claim premised upon his assertions that Melendez threatened him, that this placed him at risk, and that Melendez ultimately stabbed him. To prevail on an Eighth Amendment failure to protect claim, plaintiff bears the burden to show that prison officials both knew of and disregarded an excessive risk to the inmate's health or safety. *See Davis v. Williams*, 572 F. Supp. 2d 498, 507 (D. Del. 2008); *see also Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994); *Griffin v. DeRosa*, 153 Fed. App'x 851, 852-53 (3d Cir. 2005).

The knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware." *Davis*, 572 F. Supp. 2d at 507; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). In order to survive defendants' summary judgment motion, plaintiff must produce sufficient evidence supporting the inference that defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001) (internal citation and quotation marks omitted). Knowledge may be shown where the official has actual notice of the risk, *Nami v. Fauver,* 82 F.3d 63, 67-68 (3d Cir. 1996), or where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in

9

the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer,* 511 U.S. at 842.  An inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996).

When viewed in a light most favorable to plaintiff (the nonmovant), the competing evidence establishes that a genuine issue of material fact exists with respect to whether plaintiff told State defendants about Melendez's violent threats.  Plaintiff presents evidence, in the form of his sworn deposition, that he spoke with three prison officials concerning Melendez's continuing threats. (D.I. 82, ex. A)  Plaintiff maintains that he spoke to a correctional officer, whose name plaintiff could not recall, and told the officer that Melendez had been threatening plaintiff. (*Id.* at 4-5)  Plaintiff also stated that he asked the officer to "split up" Melendez and him. (*Id.* at 5)  Although plaintiff testified that he does not remember the officer's name, plaintiff did recall that the officer was a white male who worked on the 8-to-4 shift. (*Id.*)  Plaintiff also recalled that the alleged conversation occurred while the officer was performing a headcount on plaintiff's tier several days before plaintiff's fight with Melendez in July. (*Id.* at 4)

After the fight with Melendez, but before the stabbing, plaintiff states that he spoke with defendant Pomella. (*Id.* at 8)  Plaintiff maintains that he told Pomella that "[Melendez] keep[s] threatening me, that he going to kill me, he going to do this." (*Id.*)  Shortly after that alleged conversation, and approximately one and a half weeks before the stabbing, plaintiff states that he spoke with defendant Forbes. (*Id.* at 8-9, 37)

10

Plaintiff states that he told Forbes that "[Melendez] keep[s] threatening me, and we already done had an altercation, been in a fight. You need to split us up . . . . That he going to kill me, he going to get me." (*Id.* at 9, 37) Plaintiff maintains that the conversation occurred on the "D-tier" while plaintiff was "standing in [his] cell, [and Forbes was] standing on the outside of the cell." (*Id.* at 37) Plaintiff concedes that at no time before the stabbing did he have a conversation with defendant Profaci concerning Melendez. (*Id.* at 36)

In his sworn affidavit, Pomella maintains that at no time prior to the stabbing did he "have knowledge of any aggravating circumstances between [plaintiff] and [Melendez]." (D.I. 68, ex. F at ¶ 6) In Forbes's sworn affidavit, he states that he had "no knowledge of the relationship between [plaintiff] and Melendez. Nor do I recall any conversation with [plaintiff] asking to be separated from Melendez because of his threatening behavior." (*Id.*, ex. D at ¶ 4) In short, the issue of whether plaintiff actually had the alleged conversations with Pomella and Forbes turns into a battle of "his word against theirs." The court recognizes that credibility determinations are inappropriate on a summary judgment motion.[7]

Viewing the evidence in the light most favorable to plaintiff, a reasonable fact-finder could conclude, based on plaintiff's evidence, that State defendants Pomella and Forbes subjectively knew of the substantial risk of harm that Melendez posed to plaintiff based on Melendez's death threats. If so concluded, the fact-finder could also find that

---

[7]"[S]ummary judgment is inappropriate when a case will turn on credibility determinations." *Shah v. Bank of Am.*, 598 F. Supp. 2d 596, 603 (D. Del. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

11

State defendants' failure to separate Melendez and plaintiff and to supervise them on the night of the stabbing constituted a deliberate disregard of an excessive risk of harm.[8] If the fact-finder followed this line of reasoning, plaintiff's failure to protect claim would be proven. Therefore, based on the competing evidence from both parties, a genuine issue of material fact exists with respect to whether plaintiff told Pomella and Forbes about Melendez's violent threats. Thus, summary judgment is inappropriate on plaintiff's failure to protect claim against State defendants Pomella and Forbes.

Concerning Profaci, plaintiff admittedly did not speak with her concerning Melendez prior to the stabbing. Plaintiff produces no evidence showing that Profaci had actual notice of the excessive risk. Plaintiff also produces insufficient evidence to show that the excessive risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials" and, furthermore, fails to show that the circumstances demonstrate that Profaci had been exposed to information concerning this risk. *Farmer,* 511 U.S. at 842. Therefore, because plaintiff fails to produce sufficient evidence that Profaci was subjectively aware of the risk that Melendez posed to plaintiff, summary judgment is appropriate with respect to State defendant Profaci.

## C. Immunity

Plaintiff sues State defendants in their official and individual capacities. (D.I. 2) The claims against State defendants in their official capacities are barred by the Eleventh Amendment. *See Callahan v. City of Philadelphia*, 207 F.3d 668, 669-70 (3d

---

[8]The court finds that the failure to protect an inmate from another inmate who had issued continuing death threats poses an objective risk of excessive harm to the threatened inmate.

12

Cir. 2000). The State has not waived its immunity from suit in federal court; although

Congress can abrogate a state's sovereign immunity, it did not do so through the

enactment of 42 U.S.C. § 1983. *Brooks-McCollum v. Delaware*, 213 Fed. App'x 92, 94

(3d Cir. 2007) (citations omitted). Moreover, the claims against State defendants

cannot be maintained because State defendants, in their official capacities, are not

"persons" within the meaning of § 1983. *See Will v. Mich. Dep't of State Police*, 491

U.S. 58, 71 (1989). Therefore, the court will grant State defendants' motion for

summary judgment on the claims raised against them in their official capacities.

State defendants assert that qualified immunity applies to them in their

individual capacities. (D.I. 68 at ¶ 30) Under certain circumstances, qualified immunity

can shield a public official from civil suit. *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir.

2006) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). "Qualified immunity shields

state officials from suit where their conduct 'does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known.' " *Id.*

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity analysis

requires a two-step inquiry. First to be determined is whether the facts alleged show

that defendant's conduct violated a constitutional or statutory right. *Id.* If there is no

constitutional violation, then the inquiry ends. If answered affirmatively, the court must

then determine whether the constitutional or statutory right allegedly violated by

defendant was "clearly established." *Id.* Generally, "a right is clearly established for

purposes of qualified immunity when its contours are 'sufficiently clear that a

reasonable official would understand that what he is doing violates that right.' " *Id.* at

13

191 (citations omitted). If the court concludes that defendant's conduct violated a

clearly established constitutional or statutory right, then it must deny defendant the

protection afforded by qualified immunity. *Id.* at 190.

As discussed above, when viewed in a light most favorable to the nonmovant,

the facts as alleged by plaintiff could show that State defendants' conduct violated his

Eighth Amendment right to be protected from cruel and unusual punishment. The next

question, therefore, is whether the constitutional right allegedly violated by State

defendants was clearly established. In other words, the question becomes whether it

should have been clear to Forbes and Pomella that failing to protect plaintiff from

Melendez violated the Eighth Amendment. The Supreme Court has offered the

following direction when analyzing such an issue:

> [I]t is important to analyze the facts in [prior cases where courts found
> Eighth Amendment violations], and determine if they are materially similar
> to the facts in the case in front of us . . . .
>
> In conducting this inquiry, it is crucial to look at precedent applying
> the relevant legal rule in similar factual circumstances. Such cases give
> government officials the best indication of what conduct is unlawful in a
> given situation. If, for instance, various courts have agreed that certain
> conduct [constitutes an Eighth Amendment violation] under facts not
> distinguishable in a fair way from the facts presented in the case at hand,
> then a plaintiff would have a compelling argument that a defendant is not
> entitled to qualified immunity.

*Hope v. Pelzer*, 536 U.S. 730, 752-753 (2002) (citations and internal quotation marks

omitted).

"[I]t is well settled that when a prison official or guard has reason to know that an

inmate is in danger he must take . . . reasonable care to provide reasonable protection

from such unreasonable risk of harm." *Hamilton v. Leavy*, No. 94-336, 2001 WL

14

848603, at *8 (D. Del. July 27, 2001) (citations and internal quotation marks omitted).

After citing supportive case law from many different circuits, the court in *Hamilton*[9]

concluded that:

> [A] reasonable prison official would have known that under the Eighth
> Amendment he could not remain deliberately indifferent to the possibility
> that one of his charges might suffer violence at the hands of fellow
> inmates. Thus, without a doubt, [plaintiff]'s right to be protected from
> known risks was clearly established.

*Id.* Other cases from within the Third Circuit stand for the same proposition. *See, e.g.,*

*Day v. Fed. Bureau of Prisons*, 233 Fed. App'x 132, 133 (3d Cir. 2007); *Harvey v.*

*Brown*, No. 06-1891, 2007 WL 2893193 at *7 (D.N.J. Sept. 28, 2007); *Blizzard v.*

*Quillen*, 579 F. Supp. 1446, 1450 (D. Del. 1984). In addition to these cases, the

Supreme Court has concluded that "prison officials have a duty . . . to protect prisoners

from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations

omitted).

This case law operates to put State defendants Forbes and Pomella on notice

that their alleged failure to protect plaintiff violated plaintiff's Eighth Amendment rights.

Additionally, Pomella acknowledged in his sworn affidavit that his duties include "the

implementation of prescribed policies and procedures ensuring the enforcement of

institutional/departmental rules and regulations for staff and inmates." (D.I. 68, ex. F at

¶ 2) Forbes acknowledges similar duties in his affidavit. (*Id.*, ex. D at ¶ 2) Thus, **if**

---

[9]The facts in *Hamilton*, though not identical to the case at bar, are not sufficiently distinguishable to render the above-mentioned rule inapplicable in this case. In *Hamilton*, prison officials were allegedly aware of the need to protect an inmate from violence by other inmates and allegedly failed to do so. *Hamilton*, 2001 WL 848643 at *3-4.

State defendants actually failed to protect plaintiff from the allegedly known risk posed by Melendez, it should have been clear to State defendants, based on the case law discussed above, that such conduct violated plaintiff's constitutional rights.  Therefore, the issue of qualified immunity hinges on the failure to protect issue and the unresolved factual question regarding whether plaintiff told State defendants about Melendez's death threats.  For this reason, summary judgment is inappropriate on the issue of qualified immunity.

## V. CONCLUSION

For the aforementioned reasons, the court grants State defendants' motion for summary judgment with respect to Warden Carroll and Profaci.  With respect to State defendants Forbes and Pomella, the court grants summary judgment only on plaintiff's claim against them in their official capacities, but denies the motion in all other aspects. An appropriate order shall issue.